WAL-MART STORES, INC. *v.* REGIONS BANK TRUST DEPARTMENT, Guardian of the Estate of Michael Burkeen; Linda Burkeen, Individually, and as Guardian of the Person of Michael Burkeen

01-839                                    69 S.W.3d 20

Supreme Court of Arkansas
Opinion delivered March 7, 2002

*Quattlebaum, Grooms, Tull & Burrow PLLC*, by: *Leon Holmes, Thomas G. Williams*, and *Patrick D. Wilson*, for appellant.

*Taylor, Halliburton, Ledbetter & Caldwell*, by: *Mark Ledbetter*; and *Lane, Muse, Arman & Pullen*, by: *Richard S. Muse*, for appellees.

TOM GLAZE, Justice. This is an appeal from a jury verdict in favor of Michael and Linda Burkeen in their negligence action against Wal-Mart. In addition to asking this court to determine the sufficiency of the evidence, Wal-Mart also poses a challenge to two of the trial court's evidentiary rulings. Because the appeal presents a substantial question of law concerning the construction of a rule of evidence, jurisdiction is properly in this court under Ark. Sup. Ct. R. 1-2(b)(6).

We first turn to the facts of this case. About 6:45 p.m. on November 12, 1992, Michael Burkeen slipped and fell on a liquid substance on the floor of a Wal-Mart store in Hot Springs; the liquid apparently came from a broken snow globe that had been part of a Christmas display. He hit his head on the floor, and later reported that he had begun to experience memory problems. Through Linda, Michael sued Wal-Mart for negligence, alleging first, that the store had been negligent in how it stacked the display of snow globes, and second, that it had failed to inspect the floors and clean the liquid substance on the floor.[1]

During discovery, Wal-Mart disclosed that it wanted to introduce evidence that Linda had pled guilty to theft of property. This felony conviction resulted from a check-kiting scheme in which she had been involved after Michael's slip-and-fall accident; however, upon her successful completion of probation, Linda's record was expunged. The expungement occurred prior to Michael's filing this

---

[1] When the complaint was filed, Linda Burkeen was named plaintiff "individually and as guardian of the person and estate of Michael Burkeen." Just prior to trial, however, Regions Bank was substituted for Linda Burkeen as guardian of the estate. Linda remained as a named party in the action, individually, and as guardian of Michael's person.

suit. Wal-Mart also suggested that it would introduce the fact that Michael had pled *nolo contendere* to misdemeanor criminal mischief. Michael responded by filing a motion *in limine* to exclude evidence of his and Linda's convictions. Wal-Mart responded that the evidence of Linda's conviction was relevant to impeach her credibility, and that Michael's conviction — in particular, his conduct during the police investigation — was relevant to proving the extent of damages he allegedly suffered. The trial court granted the Burkeens' motion *in limine*, concluding that Linda's conviction had been expunged, and the evidence surrounding Michael's conviction would be more prejudicial than probative.

The matter proceeded to trial, and the jury found in favor of the Burkeens, awarding Michael $169,000 and Linda $67,000. From that jury verdict, Wal-Mart brings the instant appeal, arguing that 1) there was insufficient evidence to support the jury's finding of Wal-Mart's negligence; 2) the trial court erred in excluding evidence of Linda's felony conviction for theft of property; and 3) the trial court erred in excluding the audiotape and transcript of Michael Burkeen's interview with Police Chief Montie Sims regarding his knowledge of Linda's involvement in the check-kiting scheme.

For its first point on appeal, Wal-Mart argues that there was insufficient evidence to support the jury's finding that Wal-Mart was negligent. At the close of the Burkeens' case, Wal-Mart moved for a directed verdict, arguing that the Burkeens had failed to produce sufficient evidence to show that 1) Wal-Mart caused the snow globe to be on the floor, 2) the globe's liquid had been on the floor for any length of time, and 3) Wal-Mart had knowledge of the broken snow globe and of the substance on the floor, yet failed to remove it. The trial court granted Wal-Mart's motion as to the question of whether or not Wal-Mart had been negligent in its stacking of the snow globes, but denied it with respect to whether or not Wal-Mart knew or should have known of the presence of the substance on the floor.

Our standard of review of the denial of a motion for directed verdict is whether the jury's verdict is supported by substantial evidence. *Ethyl Corporation v. Johnson*, 345 Ark. 47, 49 S.W.3d 644 6 (2001); *City of Caddo Valley v. George*, 340 Ark. 203, 9 S.W.3d 481 (2000). We will reverse only if there is no substantial evidence to support the jury's verdict and the moving party is entitled to judgment as a matter of law. *Conagra, Inc. v. Strother*, 340 Ark. 672, 13 S.W.3d 150 (2000). Substantial evidence is that which

goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. *Caddo Valley, supra.* It is not this court's place to try issues of fact; rather, this court simply reviews the record for substantial evidence to support the jury's verdict. *Id.* In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *State Auto Prop. & Cas. Ins. Co. v. Swaim,* 338 Ark. 49, 991 S.W.2d 555 (1999); *Union Pac. R.R. Co. v. Sharp,* 330 Ark. 174, 952 S.W.2d 658 (1997). A motion for a directed verdict should be denied when there is a conflict in the evidence or when the evidence is such that fair-minded people might reach different conclusions. *Fayetteville Diagnostic Clinic v. Turner,* 344 Ark. 490, 42 S.W.3d 420 (2001). Under those circumstances, a jury question is presented and a directed verdict is inappropriate. *Id.*

■■ The principles that govern slip-and-fall cases have been frequently stated by this court. Those principles are set against the general backdrop that an owner has a duty to exercise ordinary care to maintain the premises in a reasonably safe condition for the benefit of invitees. *Fayetteville Diagnostic Clinic, supra; Morehart v. Dillard Dep't Stores,* 322 Ark. 290, 908 S.W.2d 331 (1995); *Black v. Wal-Mart Stores, Inc.,* 316 Ark. 418, 872 S.W.2d 56 (1994). To establish a violation of that duty, the plaintiff must prove either: (1) that the presence of a substance upon the floor was the result of the defendant's negligence, or (2) the substance had been on the floor for such a length of time that the defendant knew or reasonably should have known of its presence and failed to use ordinary care to remove it. *Wilson v. J. Wade Quinn Co.,* 330 Ark. 306, 952 S.W.2d 167 (1997); *Kelly v. National Union Fire Ins. Co.,* 327 Ark. 329, 937 S.W.2d 660 (1997); *Brunt v. Food 4 Less, Inc.,* 318 Ark. 427, 885 S.W.2d 894 (1994). With respect to part two of this test, the burden is on the plaintiff to show a substantial interval between the time the substance appeared on the floor and the time of the accident. *Sanders v. Banks,* 309 Ark. 375, 830 S.W.2d 861 (1992). The mere fact that a person slips and falls does not give rise to an inference of negligence. *Brunt v. Food 4 Less, Inc., supra.* Also, the presence of a foreign or slick substance which causes a slip and fall is not alone sufficient to prove negligence, but instead, it must be proved that the substance was negligently placed there or allowed to remain. *House v. Wal-Mart Stores, Inc.,* 316 Ark. 221, 872 S.W.2d 52 (1994); *Mankey v. Wal-Mart Stores, Inc.,* 314 Ark. 14, 858 S.W.2d 85 (1993).

After the trial court granted a directed verdict on the issue of Wal-Mart's negligence in stacking the snow globes, the case proceeded to the jury on the second of the two theories noted above — *i.e.*, that the substance had been on the floor for such a length of time that the defendant knew or reasonably should have known of its presence and failed to use ordinary care to remove it. Viewed in the light most favorable to the Burkeens, the evidence at trial showed the following series of events. On November 12, 1992, Michael Burkeen was shopping for light switches at the Wal-Mart. He said that he went to the Christmas department to find a toy for one of his children, "made a right turn, and the next thing [he] knew [he] was lying on the floor." After the fall, he remembered going through the checkout line, but as he walked back to his truck, he had to hold onto other cars for support.

When Michael had not returned home by 11:00 p.m., Linda and her daughter Kristy Johnson went out to look for him. Linda testified that when she found Michael, he was slumped over the steering wheel of his truck in the Wal-Mart parking lot; when she opened the door of the truck, he was semi-conscious. Kristy went into the Wal-Mart to call 911, and Linda waited with Michael. According to Linda, he kept asking where he was, and he had a knot on his head. When the paramedics arrived, Michael was still confused, but was able to talk some. At the hospital, Linda noticed that he had given an incorrect address, and he seemed confused and unaware of where he was. Since the accident, she testified that his personality had changed, and that he had become forgetful and unable to communicate or work.

Debra Sharp was shopping in the same department as Michael at the time of the accident; she had noticed a "puddle of stuff" on the floor moments before, and had warned her little girl to walk around the water. Out of the corner of her eye, Sharp saw Michael fall and heard a "pop" as his head hit the ground. His shopping cart rolled into her after he fell. Sharp stated that she only noticed the puddle because she was looking down at her daughter, and would probably not have noticed it if her children had not been with her. She described the puddle as having a "milky color like when wax gets wet and then it starts to dry," and the puddle "might have been a little smaller than eight-by-twelve" inches. She did not remember seeing the parts of a broken snow globe on the floor, but did notice snow globes on the shelves as she was shopping. Sharp further related that, "[b]ecause there was a discoloration around the edges of this puddle, it just told me that it had been there awhile. I worked in a motel for years and you kinda notice those kind of

things on the floors and know that water's been on it for a while."
On cross-examination, she conceded that she had no way of know-
ing how long the puddle had been there.

David Bateman was employed by Wal-Mart at the time of the
accident. He testified that he heard the accident and got over to that
aisle as soon as he could; upon arriving, he saw Michael sprawled
across the aisle and bleeding profusely from his hands. There was
glass protruding from his hand, and there was a broken snow globe
on the floor. Bateman cleaned up the puddle after his supervisor
arrived and instructed him to do so. Bateman stated that he did not
remember any flaking or discoloration around the edges of the spill,
but he conceded that it was possible the substance could have been
on the floor for as long as a day. He also testified that when he
cleaned up the floor, the snow globe material had "slightly discol-
ored the floor." There was a clean spot where the liquid had been,
and it looked as though the top layer of floor wax had been
removed.

The next witness to testify was Edward Sorrells, a chemist who
conducted an analysis of the snow globe's contents. He noted that
the substance inside the snow globe was primarily water, but also
contained some "dissolved solids." His analysis stated that the liquid
in the globe "would not dry simply by exposure to atmosphere, and
it would only dry completely in a forced air oven at a temperature
well above the boiling point of water. At a lower temperature, the
liquid would not dry completely and the retained dissolved solids
would regain water on cooling to regain a liquid appearance."
Sorrels also concluded that for the substance in the snow globe to
even begin to dry, it would take at least twenty-four hours. If the
borders of the liquid were "flaky," Sorrels estimated that it would
take more than a day to get that appearance.

Dale Adams, a Wal-Mart assistant manager, testified that when
he got to the area where Michael fell, he saw a broken snow globe
on the floor and associated that with the accident. Adams did not
recall whether the area where the snow globe had fallen and broken
was whitening or had changed the condition of the floor where the
liquid had been spilled. He said that he could not picture a sub-
stance being on the floor long enough to change its color. Adams
further testified that in his experiences with substances being on the
floor in Wal-Mart, either an associate or a customer would see and
report it so it could be cleaned up quickly; when anyone reported a
spill, someone from Wal-Mart would grab a paper towel as quick as
possible to get it cleaned up.

■ As noted above, the trial court granted Wal-Mart's motion for directed verdict on the question of whether or not the liquid was on the floor as the result of Wal-Mart's negligence. Thus, this court must determine whether the evidence described above was sufficient to support a finding that the substance had been on the floor for such a length of time that Wal-Mart knew or reasonably should have known of its presence and failed to use ordinary care to remove it. *See Wal-Mart Stores, Inc. v. Kelton*, 305 Ark. 173, 806 S.W.2d 373 (1991). This court has recognized that the length of time a substance is on the floor is a key factor in determining negligence, and the burden is on the plaintiff to show a substantial interval between the time the substance appeared on the floor and the time of the accident. *House v. Wal-Mart Stores, Inc.*, 316 Ark. 221, 872S.W.2d 52 (1994); *Bank of Malvern v. Dunklin*, 307 Ark. 127, 817 S.W.2d 873 (1991).

In *Wilson v. J. Wade Quinn Co.*, 330 Ark. 306, 952 S.W.2d 167 (1997), there was conflicting testimony about whether or not a substance had been on the floor for any amount of time. The trial court granted summary judgment in favor of the store, but this court reversed, holding that there a fact question was presented by the affidavit of the plaintiff, Wilson, wherein he stated that there was a "dirty looking liquid," mixed with food particles, on the floor that looked like it had been walked through for quite some time and that had spread over a wide area. Such a statement "raise[d] the specter of a foreign substance having been present long enough that store employees should have known of its presence." *Wilson*, 330 Ark. at 309.

In the present case, Wal-Mart relies on *Sanders v. Banks*, 309 Ark. 375, 830 S.W.2d 861 (1992), in which this court affirmed the trial court's grant of summary judgment and held that there was no evidence tending to establish the time between the appearance of a substance on the floor and the time of the accident. There, plaintiff Sanders had no idea how long the substance was on the floor prior to her fall, and the closest evidence on this point was her "admitted guess" that the matter was tobacco juice and that it had "gelled." In affirming, this court held that, absent some showing the substance actually was tobacco juice and evidence as to how long it would have taken it to "gel," there was no evidence that the substance had been there long enough that store personnel should have had notice of it.

■ Here, on the other hand, Michael Burkeen offered not only the testimony of Debra Sharp, who stated that, based on her

experience working in hotels, the spill looked like it had been there for some time, but also expert testimony given by chemist Ed Sorrells. As discussed above, Sorrells testified that the liquid in the snow globe would not dry simply by exposure to the atmosphere, and that, for the substance to even begin to dry, it would take at least twenty-four hours.[2] From this testimony, as well as the concession of Wal-Mart employee David Bateman that the liquid may have been on the floor for up to a day, the jury had sufficient evidence to find that the substance had been on the floor for such a substantial interval of time that Wal-Mart employees should have known of its presence and removed it.

For its second point on appeal, Wal-Mart contends that the trial court erred in excluding evidence of Linda Burkeen's felony theft conviction, which Wal-Mart sought to introduce to impeach her credibility. Linda pled guilty to felony theft of property in Yell County in 1993; the charges arose out of a check-kiting scheme in which she engaged after Michael's fall in November of 1992. On July 6, 2000, the Yell County Circuit Court entered an order pursuant to Ark. Code Ann. § 16-93-301 (Supp. 2001), expunging her record, finding that she had "satisfactorily complied with the orders of this court, and that the petition to expunge and seal should be granted." Prior to the trial in the instant case, the trial court granted the Burkeens' motion *in limine* to exclude any evidence of Linda's 1993 conviction, ruling that "an expungement is an expungement," and the felony conviction was therefore inadmissible. Wal-Mart contends that the trial court's ruling was in error, because there was no finding that Linda had been rehabilitated as required by Ark. R. Evid. 609(c). That rule provides as follows:

> Evidence of a conviction is not admissible under this rule if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure *based on a finding of the rehabilitation of the person convicted*, and that person has not been convicted of a subsequent crime which was punishable by

---

[2] Sorrells also stated that if the liquid had a "flaky" appearance around the edges, it would have had to have been there for more than a day. Wal-Mart leans heavily on this testimony and compares it to that of Debra Sharp, who said that the puddle appeared "milky." In its reply brief, Wal-Mart argues strenuously that "flaky" and "milky" are not synonymous; however, the resolution of this case does not depend on the difference between "flaky" and "milky," as there was sufficient other testimony to support the jury's verdict.

death or imprisonment in excess of one [1] year, or (2) the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

(Emphasis added.) Wal–Mart contends that, because Linda's expungement was not accompanied by a finding of rehabilitation, the underlying conviction should not have been excluded from evidence.

Here, both parties cite *Steele v. State*, 280 Ark. 51, 655 S.W.2d 381 (1983). In *Steele*, the issue presented was whether or not the trial court erred in refusing to permit defense counsel to impeach one of the State's witnesses with evidence of a prior felony conviction. The trial court had refused to allow such cross-examination because the earlier conviction had been expunged by the sentencing court. This court affirmed, writing as follows:

> This being the first interpretation of Rule 609(c) as applied to a situation where a witness's prior record has been expunged, we choose to give the rule its plain and ordinary meaning. Therefore, we hold that the trial court correctly ruled that the expungement of the prior proceedings, whether it was a conviction or not, rendered such record inadmissible. *The trial court found that [the witness] had been rehabilitated prior to the entry of the order of expungement.* Rule 609(c) requires the court to refuse to allow a conviction which has been expunged, to be used for testing the credibility of a witness.

*Steele*, 280 Ark. at 53 (emphasis added).

Here, the Burkeens contend that, under the last sentence quoted above from *Steele*, the trial court's ruling was correct. Further, the Burkeens rely on the language of Ark. Code Ann. § 16-90-902 (Supp. 2001), that states that the effect of an expungement is that "the individual's underlying conduct shall be deemed as a matter of law never to have occurred and the individual may state that no such conduct ever occurred." However, the Burkeens' argument ignores the language in the *Steele* opinion that specifically notes that the trial court in that case "found that [the witness] had been rehabilitated prior to the entry of the order of expungement." No such finding was made in the instant case. To accept the Burkeens' contentions would require this court to read the "finding of rehabilitation" language out of Rule 609(c).

■ Arkansas Rule of Evidence 609(c) is identical to Federal Rule 609(c); numerous federal cases interpreting that rule have required an explicit finding of rehabilitation before an expunged conviction may properly be excluded. *See, e.g., United States v. Swanson*, 9 F.3d 1354 (8th Cir. 1993) (trial court properly held that it could not exclude evidence of an earlier conviction based on Rule 609(c) because appellant Swanson did not provide any evidence that the dismissal of the case was based on a finding of innocence or rehabilitation); *Wilson v. Attaway*, 757 F.2d 1227 (11th Cir. 1985) (Georgia First Offender Statute,[3] which permitted court to put a defendant on probation without adjudication of guilt, did not provide for rehabilitation within the meaning of Fed. R. Evid. 609(c)); *cf. Brown v. Frey*, 889 F.2d 159, 171 (8th Cir.1989) (holding that evidence of conviction was properly excluded where convicted party received pardon "based on rehabilitation"). Further, the Fifth Circuit has noted that Rule 609 "draw[s] a distinction between pardons based on actual innocence or a finding of rehabilitation (which make the underlying conviction inadmissible for impeachment) and pardons granted solely to restore civil rights (*which have no relevance to character and do not impair the admissibility of the underlying conviction*)." *United States v. Hamilton*, 48 F.3d 149 (5th Cir. 1995) (emphasis added).

Other states interpreting Rule 609(c) have reached similar conclusions. *See State v. Hettich*, 70 Wash. App. 586, 854 P.2d 1112 (1993) (Rule 609(c) bars admission of a prior conviction only where there has been an express finding that the person convicted has been rehabilitated); *State v. Fierson*, 146 Ariz. 287, 705 P.2d 1338 (Ct. App. 1985) (explicit finding of rehabilitation is necessary in order to bar use of a prior conviction under Rule 609(c)); *Durham v. State*, 571 S.W.2d 673 (Mo. Ct. App. 1978) (Rule 609 provides that pardoned convictions can be used to impeach the credibility of a witness unless the pardon was based on a finding of rehabilitation or innocence).

■ We conclude that, in the absence of a finding that Linda had been rehabilitated, the trial court's decision to exclude evidence of her conviction under Rule 609(c) was erroneous. Wal-

---

[3] The Georgia First Offender Statute, O.C.G.A. § 42-8-60 (1982), contained language similar to Ark. Code Ann. § 16-90-902, in that it provided that a defendant is discharged upon completion of his probation, and the discharge "shall completely exonerate the defendant of any criminal purpose and shall not affect any of his civil rights or liberties," and "the defendant shall not be considered to have a criminal conviction."

Mart further points out that Linda's conviction could have been admissible under Ark. R. Evid. 609(a), which provides as follows:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the crime (1) was punishable by death or imprisonment in excess of one [1] year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or a witness, or (2) *involved dishonesty or false statement, regardless of the punishment.*

(Emphasis added.)

As previously noted, the federal rule is identical to Arkansas' rule on this point. The congressional commentary to Fed. R. Evid. 609(a) states explicitly the following:

> The admission of prior convictions involving dishonesty and false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted. Thus, judicial discretion granted with respect to the admissibility of other prior convictions is not applicable to those involving dishonesty or false statement.

Fed. R. Evid. 609(a) — Senate Conference Committee Report (1999).

A leading commentator notes that such "second-prong crimes" — *i.e.*, those involving dishonesty or false statements — clearly include crimes such as perjury, criminal fraud "in many different forms," embezzlement, and false pretense, but points out that "this list is not exhaustive, and certainly forgery and counterfeiting should be included, along with other crimes involving deceit, untruthfulness, or falsehood." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 6.32 (2d ed. 1999) (citing, as examples of such crimes, *United States v. Morrow*, 977 F.2d 222 (6th Cir. 1992) (counterfeiting); *United States v. Kane*, 944 F.2d 1406 (7th Cir. 1991) (delivering check knowing it will not be honored); *Wagner v. Firestone Tire & Rubber Co.*, 890 F.2d 652 (3d Cir. 1989) (forgery, passing bad checks)).

The crime of which Linda was convicted was check-kiting. This crime is defined as a "practice of writing a check against a bank account where funds are insufficient to cover it and hoping that, before it is deposited, the necessary funds will have

been deposited," or a "transfer of funds between two or more banks to obtain unauthorized credit from a bank during the time it takes the checks to clear." *Black's Law Dictionary* 238 (6th ed. 1990); *see also Peek v. Bank of Star City*, 237 Ark. 967, 377 S.W.2d 158 (1964). Clearly, check-kiting is a crime involving dishonesty, and as such, the trial court abused its discretion in refusing to admit evidence of Linda's earlier conviction.

Wal-Mart's third argument on appeal is that the trial court erred in excluding an audiotape and transcript of a 1993 interview Michael gave to Chief of Police Montie Sims, who was investigating the check-kiting charges against Linda and who spoke with Michael approximately six months after his fall. Wal-Mart asserted that the transcript of that interview would serve to show that Michael's memory was not as impaired as he claimed, and it argued to the trial court that the transcript was relevant to rebut Michael's claims and the testimony of his experts regarding the degree of his impairment. Prior to trial, the trial court excluded evidence of Michael's misdemeanor conviction for criminal mischief, ruling that it was not a felony that could be admitted under Rule 609. Further, the court found that the prejudicial effect of the audiotape and transcript outweighed any probative value they might have, and therefore rejected Wal-Mart's proffer of the items.

On appeal, Wal-Mart continues its argument that it should have been permitted to introduce the tape and transcript to show that, contrary to Michael's tests, he had ample memory and could carry on a normal conversation under stressful conditions. His interview with Officer Sims, Wal-Mart submits, belies the claims of Michael's expert witnesses and his family as to the severity of Michael's brain impairment and that he had no short-term memory. Wal-Mart asserts that, when confronted with possible criminal prosecution, Michael "answered the questions precisely, intelligently, and to the point" and "had vivid recall of the name of the bank officer who had contacted him, his whereabouts, conversations with his wife and other matters." Wal-Mart notes that it is readily apparent from the tenor of the conversation between Michael and Officer Sims that Michael had no problems remembering details and recent events; such evidence stood in direct contrast to testimony from one of Michael's neuropsychologists who testified that Michael "could not even remember to come in out of the rain."

Ordinarily, questions regarding the admissibility of evidence are matters entirely within the trial court's discretion, and

such matters will not be reversed absent an abuse of that discretion. *See, e.g., J. E. Merit Constructors, Inc. v. Cooper,* 345 Ark. 136, 44 S.W.3d 336 (2001). Here, however, the trial court rendered its decision regarding the audiotape and transcript in light of its previous decision to exclude evidence of Linda's conviction. Because the tape contained lengthy discussions of Linda's involvement in the check-kiting scheme, as well as Michael's knowledge of her involvement, the trial court ruled that to introduce the transcript and tape would be unduly prejudicial. However, as discussed above, the trial court's decision to exclude Linda's felony conviction was premised on an erroneous application of Ark. R. Evid. 609(c). That conviction should have been admitted into evidence, and had the trial court ruled properly on that evidentiary question, it is likely that the jury's hearing of Michael's interview would have posed less danger of unfair prejudice. Accordingly, we hold that the trial court likewise abused its discretion in excluding the audiotape and the transcript.

Affirmed in part; reversed and remanded in part.

HANNAH, J., dissents.

CORBIN, J., not participating.

JIM HANNAH, Justice, dissenting. I must respectfully dissent. While I agree with the majority that there is sufficient evidence to support the jury's finding that Wal–Mart was negligent, I cannot agree with the majority's holding that the expunged conviction of Mrs. Burkeen is admissible under Ark. R. Evid. 609(c) for purposes of impeachment in a civil trial. This holding is directly contrary to our holding in *Steele v. State,* 280 Ark. 51, 655 S.W.2d 381 (1983). There are two instances where an expunged conviction is admissible. Neither is applicable under the facts of this case. I find no basis for this court's holding on admissibility of expunged convictions in the law of this State and find the foreign-jurisdiction analysis provided by the majority unconvincing.

In reading the majority opinion, I must conclude that the holding is based upon a failure of Mrs. Burkeen to use the correct words in drafting her order expunging and sealing her conviction. It appears this Court now holds exact wording in the order is required by Rule 609(c) before expungement is effective. I must note that expungement is granted by statute, not by the rules of this Court.

At issue is the following language from Rule 609(c): "Evidence of a conviction is not admissible if (1) the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based upon a finding of rehabilitation of the person convicted. . . ." It seems abundantly clear from the plain language of this sentence that where a conviction has been expunged according to law it is inadmissible. This court, however, cites to *Steele, supra,* in finding confusion where there is none. In *Steele,* this court held that the evidence of the conviction was properly excluded because the "[t]rial court found that he had been rehabilitated prior to entry of the order of expungement." *Steele,* 280 Ark. at 53. Basing its decision on the literal language of the opinion in *Steele,* the majority finds meaning and direction from the opinion in *Steele* where none was intended. Relying on specific words used in the *Steele* opinion, the majority holds in the present case that because "[n]o such finding [of rehabilitation] was made in the instant case," the conviction was admissible even though it had been expunged. It is true that the word "rehabilitation" does not appear in the order in Mrs. Burkeen's case, but neither does it appear in the order in *Steele.* The majority reads more into the opinion in *Steele* than is to be found there. The court in *Steele* stated, "The order stated that LaFerney had met all the terms and conditions of the earlier order and had in fact been a model citizen." *Steele,* 280 Ark. at 52.

The word "rehabilitation" does not appear in the order expunging the witness's conviction in *Steele.* The Court just used the word "rehabilitation" in its opinion in characterizing that the terms and conditions of the earlier order had been met. The order in *Steele* provides in pertinent part "that the defendant has met all conditions pursuant to said plea and the behavior of the defendant since January 26, 1978, has been exemplary and the defendant has conducted himself as a model citizen." The order regarding Mrs. Burkeen provided more simply in pertinent part, "[t]hat the Court now finds that the Defendant has satisfactorily complied with the orders of this Court, and the Petition to Expunge and Seal should be granted." It is apparent that in both cases the defendants had done what the court required of them when they were convicted under a statute allowing later expungement, and that both had complied and received expungement as provided under the statute.

What we are engaged in is a discussion of who drafted the better order. The order in *Steele* was certainly more extensive, but no more effective than the order in this case, and neither order used

the word "rehabilitation." What is at issue is a hypertechnical definition of what Rule 609(c) requires. Arguments against hypertechnical interpretation by this court of its own rules has been the subject of other dissents. *Friend v. State*, 315 Ark. 143, 865 S.W.2d 275 (1993).

If we consider the expungement statute, this matter becomes more clear. The effect of expungement is set out in Ark. Code Ann. § 16-90-902 (Supp. 2001), wherein its provided:

> (a) An individual whose record has been expunged in accordance with the procedures established by this subchapter shall have all privileges and rights restored, shall be completely exonerated, and the record which has been expunged shall not affect any of his civil rights or liberties, unless otherwise specifically provided for by law.

> (b) Upon the entry of the uniform order to seal records of an individual, the individual's underlying conduct shall be deemed as a matter of law never to have occurred, and the individual may state that no such conduct ever occurred and that no such records exist.

I have found two instances where an expunged conviction is admissible in Arkansas. The present case fits into neither instance. The first instance is set out in the expungement statutes. Ark. Code Ann. § 16-90-901(a)(3) provides that expungement does not apply to the case of a sexual offense as defined therein. The second instance is where the conviction is used to determine punishment as an habitual offender. *McClish v. State*, 331 Ark. 295, 962 S.W.2d 332 (1998); *Neal v. State*, 320 Ark. 489, 898 S.W.2d 440 (1995); *Gosnell v. State*, 284 Ark. 299, 681 S.W.2d 385 (1984). Somewhat similarly to the use in enhancement of punishment of habitual offenders, Act 595 of 1995, approved March, 13, 1995, would also allow use of an expunged felony in proof of a felon in possession of a firearm; however, as noted in *Ross v. State,* 344 Ark. 364, 39 S.W.3d 789 (2001), this is still uncodified.

In holding in *Gosnell, supra,* that expunged felony convictions could be admitted for purposes of determining enhanced punishment, this court stated:

> There is good reason to follow the basic rule of statutory interpretation in this instance. Every benefit extended by this statute is of the type to encourage the offender's progress toward rehabilitation. That is, a reformed convict should be encouraged to apply for a

job, to assert his civil rights, as by registering to vote or running for office, and to discharge a good citizen's duty to appear as a witness without fear of unnecessary embarrassment. But there is no reason either to encourage him to commit another crime or to believe that the legislature intended to do so. The trial judge was right in refusing to read into the statute a provision that is simply not there and that would actually be contrary to the over-all legislative intent.

*Gosnell*, 284 Ark. at 301. In *Gosnell*, the court was considering expungement of a youthful offender, but the principle is the same in the present case even though it was an adult offender under a different statute.

Resort to federal cases and cases from foreign jurisdictions is unnecessary and confuses the issue further. Existing Arkansas law is determinative of the issue. Also, although as stated in the majority opinion, the wording of the federal rule and the rule in other States may be identical, that alone is not sufficient to resort to consideration of interpretation of those rules in their jurisdictions. The statutes and law at issue in this case are Arkansas law, while the precedent cited from the federal courts and foreign jurisdictions is based on wholly different law. Even where the statute in Georgia is similar, the precedent is not helpful because we have our own that controls. This court has already spoken on this issue:

The order stated that LaFerney had met all the terms and conditions of the earlier order and had in fact been a model citizen. The order provided that all charges were dismissed.

. . . .

Therefore, we hold that the trial court correctly ruled that the expungement of the prior proceedings, whether it was a conviction or not, rendered such record inadmissible. The trial court found that he had been rehabilitated prior to the entry of the order of expungement. Rule 609(c) requires the court to refuse to allow a conviction which has been expunged, to be used for testing the credibility of a witness.

*Steele, supra,* 280 at 52-53. Wal-Mart wished to use the evidence to impeach Mrs. Burkeen. This court has declared an expunged conviction may not be used for that purpose. *Steele, supra.*

The majority also cites the United States House-Senate Conference Committee Report on Fed. R. Evid. 609(a) for the proposition that Fed. R. Evid. 609 was intended especially to provide for admission of prior crimes involving dishonesty and false statements because these are particularly probative of credibility. That should come as no great surprise to anyone, but discussion of paragraph (a) is not helpful. It simply further confuses the issue. Paragraph (a) of Rule 609 is not at issue. Paragraph (c) of Rule 609 is at issue, and this court's holding is directly contrary to our holding in *Steele, supra.*

We are struggling with the use of specific words. As a general proposition, this court has declined to require "magic words." *Miller v. State*, 269 Ark. 341, 605 S.W.2d 430 (1980) (reversed on other grounds in *Willett v. State*, 335 Ark. 427, 983 S.W.2d 409 (1998)). *Curtis v. Patrick*, 237 Ark. 124, 371 S.W.2d 622 (1963). Neither the order in *Steele*, nor the order in the present case even mentions rehabilitation. Both indicate that the conditions set out by the sentencing court were met, and the party was entitled to expungement. Under the holding of this court, expungement obtained under the same statute may or may not be effective. It depends on whether the order was worded just so to meet the new requirements of Rule 609(c), a rule of evidence, not a rule or statute affording expungement. The trial judge called it right — "expungement is expungement." To find otherwise is to judicially nullify expungement provided for by statute in holding that although the legislature intended that the conduct is to be deemed to have never occurred, this court may declare that the conviction is revived by an evidentiary rule.

The majority also holds that because the conviction of Mrs. Burkeen was excluded in error, the trial court abused its discretion in excluding the audiotape of Mr. Burkeen. This was based on the premise that if the conviction was admissible, then so was the audiotape. The audiotape was of an interview of Mr. Burkeen where he was being asked about Mrs. Burkeen's involvement in the activities that led to her conviction. Because I believe that the conviction was properly excluded, I would not find the trial court abused its discretion in excluding the audiotape. I would affirm on the trial court's exclusion of Mrs. Burkeen's conviction and the exclusion of the audiotape as well.

I would affirm.